# EXHIBIT A

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019-6799

212-506-1700

FACSIMILE: 212-506-1800

WRITER'S DIRECT DIAL NUMBER
(212) 506-1903

ATLANTA
HOUSTON
NEWARK
SAN FRANCISCO

July 5, 2007

BY HAND

Honorable Lewis A. Kaplan
United States District Judge
United States District Court
  for the Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re: *Hartford Life Ins. Co. v. Bank of America Corp., et al.* ("BofA" or "Bank"), 06-CV-3805 (*In re Parmalat Secs. Litigation*, 04-MD-1653 (LAK))

Dear Judge Kaplan:

On behalf of plaintiff Hartford Life Insurance Company ("Hartford Life"), we submit this letter in response to BofA's June 25, 2007 submission (addressed to Magistrate Judge Henry Pitman). In its submission, BofA seeks an adjudication of its claim of attorney-client privilege with respect to a document it claims it inadvertently produced. Rather than focus on the bona fides of its claim, however, BofA accuses our firm of intentionally violating the governing Protective Order because we allowed the use of the document at issue in the expert report prepared by Roberts W. Brokaw III (the "Brokaw Report") after BofA had asserted its claim of privilege in a mass email to all MDL parties. That accusation is as baseless as it is hypocritical: *The defendants themselves gave us this document after they claimed it was privileged – in direct contravention of their own claim of privilege.*

The Bank produced this very document – a slide show presentation entitled "Overview of the Due Diligence Process in Capital Markets Transactions" – to our firm in September 2006 *just weeks after* it identified the document as privileged in an August 22, 2006 "demand" letter to the other MDL parties. In other words, *the Bank itself violated its own claim of privilege* by failing to remove the document from its *own* production and then *producing* this very document to us *after* it had demanded that all other parties remove it. And there is more: the Bank produced the document yet again (this time under different Bates numbers) to *all* of the MDL parties, and then months later made a half-hearted attempt in February 2007 to notify the parties of its claim of privilege through a solitary mass e-mail, with no follow up and no demand for return. The result was that this supposedly "privileged" document sat on a litigation-related website (the "FTP website"), freely available to the multitude of parties for many months until the Bank's ire was

1495847

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Honorable Lewis A. Kaplan
July 5, 2007
Page 2

raised in June 2007 by the Brokaw Report. This is not a "privileged" document; it is practically in the public domain. Moreover, the nature and substance of the document itself also belie any claim of privilege: the document for which the Bank would have this Court "un-ring the bell" was attached as an appendix to the Bank's own due diligence policy manual – a manual that the Bank witnesses have relied on in seeking to raise the "due diligence" defense. (We refer to the disputed document as the "Slide Show Appendix" or the "Document").

As we demonstrate below, the defendants' claim of privilege fails on every conceivable ground: (a) the Bank itself disregarded its own claim of privilege in that their own lawyers produced it, not once or even just twice, but three times in this case, and gave it to us after they identified it as subject to a claim of privilege; (b) the contents of the document are neither confidential nor legal advice; (c) the Bank failed to "jealously guard" any possible claim to privilege; and (d) the Bank itself has put this material at issue, since it is an integral part of a manual that describes the Bank's due diligence practices, which the Bank has raised as a defense against Hartford Life's claims.

## I. The Bank Itself Disregarded its Own Claim of Privilege.

However much the defendants would prefer to ignore the fact that they themselves violated their own claim of privilege, the basic chronology is irrefutable:

- May through August 2006. Hartford Life filed its complaint in this action in May 2006, and was assigned thereafter to the *In re Parmalat* multi-district litigation. By the summer of 2006, the other MDL parties had already begun discovery and had exchanged documents. No documents were to be produced by the defendants to Hartford Life, however, until it signed on to the Stipulated Protective Order among the MDL parties (dated August 3, 2005) (Ex. A). Hartford Life executed the Protective Order in June, 2006; on August 4, 2006, the Court (Cote, J.) issued an order adding Hartford Life to the Stipulated Protective Order. This order was confirmed by a subsequent Order (Kaplan, J.), dated September 13, 2006. (Both orders are attached behind the Protective Order, at Ex. A.)

- August 22, 2006. In the meantime – prior to any document production to Hartford Life – on August 22, 2006, BofA sent a letter to all MDL parties, advising them that the Slide-Show Appendix had been inadvertently produced and asserting a claim of privilege as to that document. In making this claim, BofA specifically identified the document by Bates numbers BOFA-1843869 to BOFA-1843916. Hartford Life is unaware of any record of any party having responded to this August 2006 letter. (*See* Cobb Decl. Ex. A)

- September 2006. On August 31 and September 1, 2006, the parties made their respective Rule 26 initial disclosures. On September 11, 2006 – *three weeks after the August 22, 2006 claim of privilege* – BofA produced hundreds of thousands of

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Honorable Lewis A. Kaplan
July 5, 2007
Page 3

>pages to Hartford Life, *including the Slide Show Appendix,* with Bates numbers BOFA-1843869 to BOFA-1843916.

- February 2007. The Slide Show Appendix appeared at least *twice* in the productions the defendants made to all MDL parties. In addition to the document at the Bates range BOFA-1843869 to BOFA-1843916, the identical document re-appears in the defendants' production at Bates numbers BOFA-2036748 to BOFA-2036795. Another party to the MDL posted this latter version of the document to the *Parmalat* litigation FTP website (available to all parties, defendants and plaintiffs alike) in connection with a 30(b)(6) deposition that was scheduled to occur in February 2007. Hartford Life neither noticed nor attended that deposition and had no other involvement with it.

- February 12, 2007. On February 12, 2007, BofA sent a mass e-mail to all MDL parties that stated *in toto*:

  Subject: In re Parmalat: Privileged Bank of America Document

  Counsel: Please see the attached correspondence regarding a privileged Bank of America document posted for Wednesday's 30(b)(6) deposition on Topic 30 of Bondi's Deposition Notice to Bank of America. Regards, Brian.

Attached to this e-mail was a pdf-computer file containing a one-paragraph letter from Sidley Austin LLP (counsel to BofA), which stated *in toto*:

> I write regarding a privileged Bank of America document that has been posted by Quinn Emanuel as a potential exhibit for the upcoming 30(b)(6) deposition on Topic 30 of Bondi's Amended Deposition Notice to Bank of America. The document bearing Bates stamp BOFA-2036748 through BOFA-2036795 is privileged and was inadvertently produced. I note that this document is identical to BOFA-1843869 through BOFA-1843916, which has been identified to you as privileged on at least two prior occasions. On each of those occasions, we asked you to remove this document from your database and refrain from posting or using the document at future depositions. Pursuant to the Protective Order, we ask that you take the same action with respect to BOFA-2036748 through BOFA-2036795.

(The email and letter are attached as Exhibit B.) Neither the email nor the letter required any response from any recipient. In fact, this "notice" failed to demand a "return" of the document as is contemplated by the Protective Order. (*See* Ex. A, Protective Order, ¶ 4.) And Hartford

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Honorable Lewis A. Kaplan
July 5, 2007
Page 4

Life is aware of no response from any party. Nor did BofA follow up in any fashion to ensure that all parties agreed to comply with its request or had in fact complied by "returning" the document. The defendants certainly had no further contact with Hartford Life on the matter until four months later.

- February 2007 to June 2007. As a consequence of BofA's failure to pursue the matter and confirm compliance with its request, the Slide Show Appendix remained posted on the FTP website for almost *four full months*. This document was thus available on the website for viewing and down-loading by any party to the MDL.

- June 2007. On June 4, 2007, Hartford Life served a copy of the Brokaw Report on the defendants and all MDL parties. The Brokaw Report cites to and discusses the defendants' due diligence manual, including the Slide Show Appendix.[1] The next day, by letter, the defendants re-asserted their claim of privilege and demanded that Hartford Life retract the Brokaw Report. They also re-iterated their request to other MDL parties that the document be removed from the FTP website, which was only just removed in June. Hartford Life objected to this privilege claim, but proposed to redact the Brokaw Report temporarily, pending resolution of the matter. After some delay on its part, BofA finally agreed to Hartford Life's proposal. (Ex. C.)

- June 18 Retraction. On June 18, 2007, Hartford Life sent to all MDL parties a retraction email, demanding a response from each recipient. For those recipients that did not respond, Hartford Life has sent individualized follow-up correspondence requiring an indication of whether each had complied with the request that the document be "returned" (*i.e.*, destroyed and eliminated from each recipient's electronic files). (The retraction correspondence and the spreadsheet record of responses, along with a sampling of email responses, are attached as

---

[1] The defendants have suggested that our firm improperly provided the Slide Show Appendix to Hartford Life's expert, knowing that it was subject to a claim of privilege by the Bank. As we explained in our correspondence with the Bank, we were unaware of the claim of privilege until the Bank objected to the June 4 Brokaw Report. (Ex. C.) While we acknowledge that we did receive the February 12, 2007 email notification from BofA, it was simply overlooked in the heavy e-mail traffic in this case. Moreover, on a matter of import like privilege, we would have expected that the retraction email at the very least (i) identify the document clearly (not just by reference to a "topic number" and to generic Bates numbers in an attachment); (ii) demand that the document be "returned" (*i.e.*, destroyed); and, (iii) most importantly demand an affirmative response or acknowledgement from each recipient, so that the proponent of the privilege could follow up with further correspondence to ensure compliance. None of that happened here. Nor was the document privileged on its face. (In fact, defense counsel produced the document in at least two different places in BofA's document productions, which certainly suggests that even the BofA attorneys did not recognize it as privileged on its face in conducting their privilege review of their own production.) In any event, to comply with the spirit of the Protective Order, and allow BofA the process afforded it under that Order, we offered to, and did, redact the Brokaw Report pending resolution of this privilege dispute. (*See* the parties' correspondence, Ex. C.)

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Honorable Lewis A. Kaplan
July 5, 2007
Page 5

Ex. D.) Hartford Life thus fully complied with Fed.R.Civ.P. 26(b)(5)(B) by sequestering the document at issue and retrieving the disputed material by retracting the unredacted Brokaw Report from each person to whom Hartford Life had sent it.[2]

By any measure, on these facts, the Bank itself did not take its own claim of privilege in the Slide Show Appendix seriously. It is no accident that the document has re-appeared a number of times in the Bank's document productions (in two different Bates ranges). As even the Bank's own evidentiary showing makes clear, the Slide Show Appendix was widely distributed to BofA employees as an appendix to an employee due diligence manual. But that is yet another basic, indisputable fact that BofA conspicuously fails to mention in its submission to the Court, as discussed in the next section.

II. **The Slide Show Appendix is Not Privileged on its Face and the Bank's Showing Likewise Fails to Establish Privilege.**

The attorney-client privilege does not automatically shield every communication from a lawyer. Rather, the party invoking the privilege must show: "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Schiller v. City of New York*, 04 Civ. 7922, 2007 U.S. Dist. Lexis 39225 (S.D.N.Y. May 23, 2007); *Fisher v. United States*, 425 U.S. 391, 403 (1976). This showing must be made, moreover, with competent evidence and cannot be "discharged by mere conclusory or ipse dixit assertions." *Von Bulow v. Von Bulow*, 811 F.2d 136, 144-46 (2d Cir. 1987), *cert. denied*, 481 U.S. 1015 (1987) (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965)).

In its submission (at p. 3) the Bank suggests that any reasonable attorney would have recognized that the Slide Show Appendix was a privileged attorney-client communication on its face (despite the fact that its own attorneys have repeatedly produced the document in its productions). In support, the Bank points out that the document indicates that it was prepared by the BAS Legal Department and an outside law firm, Davis Polk & Wardwell, LLP. But, of course, that alone does not establish privilege. The fact that a communication came from counsel does not *ipso facto* make the communication either confidential or legal advice. Rather, privilege is assessed from the content of the communication and the surrounding facts and circumstances (as shown through evidence). Here, neither the content of the document nor BofA's showing as to the circumstances support a finding of privilege here.

---

[2] The defendants nevertheless maintain in their submission (at pp. 1 n.1 and 3), with no support, that Hartford Life not only intentionally violated the Protective Order, but continues to be in violation of it – despite our methodical effort to retract what ultimately is not even privileged. Of course, the defendants' hyperbole is all the more ironic given that they themselves did not expend a fraction of this effort in seeking the return of the Slide Show Appendix in the first place.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Honorable Lewis A. Kaplan
July 5, 2007
Page 6

### A. The Document Contains No Privileged Material

The Document on its face is merely a factual description of the Bank's policy and procedures with respect to due diligence. The Document has no legend or other markings to indicate that the document or its contents included privileged or confidential material. Nor does the Document itself suggest that recipients were under instructions to hold it in confidence and limit its use and dissemination. The Document expressly states its purpose: "This presentation is intended to provide you with general guidelines to help you design the appropriate due diligence plan." This has nothing to do, on its face, with seeking or imparting legal advice.

Moreover, the document the Bank claims is privileged was just one part of a larger document, an employee manual on the Bank's due diligence policies and procedures. (*See* the accompanying *In Camera* Addendum, which provides to the Court the entirety of the document, BOFA-1843764-1843916) (the "Due Diligence Manual") The full document is entitled, "Banc of America Securities, Debt Capital Markets, Due Diligence Policy and Procedures (March 1, 2002, Banc of America Securities)." (Add. at BOFA-1843764) The table of contents on the second page of this manual identifies five chapters and indicates that the Slide Show is an "appendix" to the manual: "Appendix: Overview of the Due Diligence Process in Capital Markets Transactions." (Add. at BOFA-1843765)

The first chapter is entitled "GCIB Due Diligence Training & Policy Statement." The remaining chapters address various different capital market sectors, including "Syndicated Finance Process," "High Yield Process" and the "Private Placement Process." In fact, in overall substance, these main chapters in the disclosed manual address the very same points about BofA's due diligence policies and practices as are addressed in the appended Slide Show Appendix that BofA is trying to conceal from discovery.[3]

Viewed in its full context, the Slide Show Appendix was literally just one part of a larger business document: a handbook that addressed business practices, that quite obviously was widely distributed to Bank personnel, and that *did not* segregate any portion as involving confidential legal advice.

---

[3]   Both the Due Diligence Manual and the Slide Show Appendix discuss the securities laws, underwriter liability and the due diligence defense. Compare the following excerpts from the Due Diligence Manual with the Slide Show Appendix: (a) BOFA-1843769 ("an underwriter may avoid liability if it can be demonstrated that, after reasonable investigation, it had reasonable grounds to believe that at the time the registration statement became effective it did not contain a material misstatement or omission") *with* BOFA-1843879 (Slide Show); (b) BOFA 1843777 ("[t]he senior banker assigned to an offering shall have the primary responsibility of overseeing the associate banker's due diligence review") *with* BOFA-1843888 (Slide Show); and (c) BOFA-1843771 ("the investment banker should become as familiar as possible with the industry in which the issuer operates") *with* BOFA-1843895 (Slide Show).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Honorable Lewis A. Kaplan
July 5, 2007
Page 7

### B. The Bank Has Failed to Show Privilege

Presumably aware of its evidentiary burden, the Bank submitted a declaration from in-house counsel, Isaac Osaki, a Bank attorney who "helped prepare the Document and participated in presenting it." (Osaki Decl. ¶ 3.) This declaration – which is the full extent of the Bank's proof on its application – generally describes how Davis Polk & Wardwell and BAS's in-house counsel worked together to prepare and present the Slide Show at the April 28 and May 12, 2003 presentations to "BAS employees" who were involved in due diligence for securities offerings. (Osaki Decl. ¶¶ 3-5.) But this paltry showing is remarkable for what it omits. *Most tellingly, it fails even to note that the document at issue was attached as an appendix to an employee due diligence manual.* And, it fails in any event to answer the most basic questions: How many employees attended these presentations? When was the Document appended to the 2002 Due Diligence Manual? Which employees received the Document as part of the larger Due Diligence Manual? What were the positions of these unidentified "attendees" and other employee-recipients? Were any of these unidentified "BAS employees" authorized to speak or act for the Bank in relation to the subject matter of the communication? Were hard-copies of the slide show presentation distributed to the attendees or to any others (aside from the recipients of the Due Diligence Manual)? Were the employees advised that this material contained privileged communication? Were any precautions taken to ensure that the material was kept confidential? Is there any other indication that the attendees and other recipients understood that the Slide Show information was to be kept confidential or otherwise segregated from the larger due diligence manual? *See generally Coastal States Gas Corp. v. Dept. of Energy*, 617 F.2d 854, 863 (D. D.C. 1980) ("The test [of whether the circulation of an otherwise privileged communication to others within an agency waives the privilege] is whether [it can be demonstrated] that the documents, and therefore the confidential information contained therein, were circulated no further than among those members of the organization who are authorized to speak or act for the organization to the subject matter of the communication."); *In re FTC*, Misc. No. M18-304, 2001 U.S. Dist. LEXIS 5059, *6 (S.D.N.Y. April 19, 2001) ("The key, of course, to whether an attorney/client relationship existed is the intent of the client and whether he reasonably understood the [communications] to be confidential.").

Moreover, while Mr. Osaki makes the conclusory claim that in his "view" the document was "intended to convey and did convey legal advice" regarding "due diligence as a legal defense to liability under the U.S. securities laws" (Osaki Decl. ¶ 7), he does not specifically identify which part of the document constitutes such advice. Indeed, he fails to acknowledge that the document predominantly *describes* the Bank's policy and practice regarding due diligence as a business matter, and that the vast majority of this very same information is presented in the unprivileged, disclosed portions of the larger Due Diligence Manual. *See Conopco, Inc. v. Wein*, 05 Civ. 09899, 2007 U.S. Dist. LEXIS 46945, at *17-18 (S.D.N.Y. June 27, 2007) (work by attorney to "clarify the nature of the [client's] programs" is business advice, not legal). "It is entirely insufficient to sustain a claim of privilege for an attorney to state in an affidavit without more that a document reflects his 'legal advice' and is therefore privileged in its

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Honorable Lewis A. Kaplan
July 5, 2007
Page 8

entirety." *SICPA Holdings S.A. v. Optical Coating Lab.*, Civil Action No. 15129, 1996 Del. Ch. LEXIS 118, at *9 (Del. Ch. 1996).

This "showing" by BofA raises more questions than it answers. It does not satisfy the substantial burden needed to invoke a privilege at cross-purposes with the truth-seeking function of the judicial process. *See In re Omeprazole Patent Litig.*, MDL Docket No. 1291, 2005 U.S. Dist. LEXIS 6112, at *19 (S.D.N.Y. Feb. 18, 2005) (attorney-client privilege "should be strictly confined within the narrowest possible limits underlying its purpose"), quoting *United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 504 (2d Cir. 1991).

(1) <u>The Document Is Not Confidential In Nature</u>. Other factors further support the conclusion that, contrary to the Bank's position, the Slide Show Appendix is *not* confidential in nature:

(i) Because the Document was part of the Bank's Due Diligence Manual, it is implausible to assume (without any further proof) that the recipients would have known to segregate the Document from the Bank's manual and treat is as confidential communication. Where, as here, it is unclear from the face of the Document and the manner in which it was disseminated that it was intended to be a privileged communication, it is incumbent upon the Bank to mark the Document as confidential before disseminating it to its employees – which it did not do. *See Hardy v. New York News Inc.*, 114 F.R.D. 633, 644 (S.D.N.Y. 1987) ("in a situation where the author or recipient of allegedly privileged documents functions as a corporate manager as well as an attorney, efforts must include clear designation of those communications sent or received in his capacity as a legal advisor"). *Accord Conopco, Inc. v. Wein*, 05 Civ. 09899, 2007 U.S. Dist. LEXIS 46945, at *15-18 (S.D.N.Y. June 27, 2007).

(ii) The Document's generic descriptions of the law as it might apply in the securities industry do not constitute "confidential" information. The only law-related potions of the Document are references to "What Courts Have Said" on generic points of law and the general exhortation that the securities laws recognize a "due diligence" defense to some claims of securities fraud and misrepresentation (which is hardly a secret in the industry). (*See, e.g.*, pp. BOFA-1843879, BOFA-1843882 to BOFA-1843884.) This is not the kind of information that is privileged since such a generic description of the law does not directly or indirectly reveal any client confidences. In the context of the attorney-client privilege, the question of "confidential-ity" pertains to the nature of the information *from or belonging to* the client, not the general legal knowledge of the attorney. *See Urban Box Office Network, Inc. v. Interfase Managers*, 01 Civ. 8854, 2006 U.S. Dist. LEXIS 20648, at *16 (April 18, 2006) ("The attorney-client privilege protects only those papers prepared by the client for the purpose of confidential communication to the attorney or by the attorney to record

confidential communications.") (*quoting Colton v. United States*, 306 F.2d 633, 639 (2d Cir. 1962)). *See also Avery Dennison Corp. v. UCB Films PLC*, Case No. 95 C 6351, 1998 U.S. Dist. LEXIS 15727, at *9-10 (N.D. Ill. Oct. 1, 1998) ("communications from the attorney to the client should be deemed privileged only if the statements do in fact reveal, directly or indirectly, the substance of a confidential communication by the client"); *Bank Brussels Lambert v. Credit Lyonnais, (Suisse) S.A.*, 160 F.R.D. 437, 441-42 (S.D.N.Y. 1995) (same); *Martin v. Valley National Bank of Arizona*, 140 F.R.D. 291, 304-305 (S.D.N.Y. 1991) (same). Here, there has been no showing that the Document reflects or reveals any such confidential information belonging to the Bank. Rather, the only information belonging to the Bank in the Slide Show Appendix is the same factual information already disclosed in other portions of the Due Diligence Manual. Any such factual information in the Document about the Bank's practices cannot, without more, constitute "confidential" information sufficient to be protected by the attorney-client privilege. *See Martin*, 140 F.R.D. at 303 ("The privilege does not apply to purely factual material.").

(2)  <u>The Document Does Not Impart Legal Advice</u>. Moreover, the Bank has not demonstrated that the Document was made for the predominant purpose of providing legal advice pertaining to the Bank's particular factual situation and confidential communications, as opposed to general business advice.

It is well established that the attorney-client privilege applies only where legal advice, not business advice, is sought. *Urban Box Office Network v. Interfase Managers, L.P.*, 01 Civ. 8854, 2006 U.S. LEXIS 20648, at *14 (S.D.N.Y. April 18, 2006); *NXVIM Corp. v. O'Hara*, Civ. No.1:05-CV-1546, 2007 U.S. Dist. LEXIS 13660, at *49 (N.D.N.Y. Feb. 9, 2007) (privilege is triggered only by a request for legal advice, not business advice); *Hardy v. New York News*, 114 F.R.D. 633, 643-644 (S.D.N.Y. 1987) ("When the ultimate corporate decision is based on both a business policy and a legal evaluation, the business aspects of the decision are not protected simply because legal considerations are also involved.") Here, it is clear from the contents of the Document and its high level of generality that it purports to impart business advice as to policy and practice, albeit informed by the contours of applicable law. *Cf. Conopco, Inc. v. Wein*, 05 Civ. 09899, 2007 U.S. Dist. LEXIS 46945, at *18-19 (S.D.N.Y. June 27, 2007) (where the communication with counsel relates to a "specific dispute" or concern, it is more likely to be legal, as opposed to business, advice). Also, the Bank's own actions with respect to the Document are telling. The Bank clearly viewed this Document as imparting only business advice as it incorporated the Document wholesale into the Bank's Due Diligence Manual, without any modification to or redaction of its contents or any confidentiality designation. *See Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 360 (2d Cir. 2005) ("the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy").

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Honorable Lewis A. Kaplan
July 5, 2007
Page 10

The case relied on by the Bank in its submission – *In re County of Erie*, 473 F.3d 413 (2d Cir. 2007) – is a good example of the kind of legal discussion that *is* privileged. Contrary to the Bank's view, however, the *County of Erie* decision supports a finding in our case that the Slide Show Appendix is *not* privileged. In the *County of Erie* case, Erie County appealed an order requiring it to produce communications about its search policies that were made between an attorney and officers who were responsible for formulating, implementing and monitoring the county's policies. 473 F. 3d at 415-416. The communications at issue concerned discussions about the constitutionality of the existing county policies, the potential for liability from implementing the existing policies, proposals for alternative policies, and guidelines for implementing the alternative policies. The Second Circuit held that these communications were privileged because they had the predominant purpose of soliciting or rendering legal advice. *Id.* at 421-423. Here, even on the Bank's showing in the Osaki declaration, it is clear that the Slide Show Appendix does not include any discussion of the kind at issue in *County of Erie* – namely, a discussion between legal counsel and policy makers about the legal pros and cons of any given policy or proposed changes thereto in order to ensure compliance with the law. Rather, the Slide Show Appendix merely described for employees the Bank's policies and practices and some of the legal rationale that informed them, without any "advice" as to the legal strengths or weaknesses of any particular policy or practice.

As noted, certain sections of the Document generally discuss the securities laws and due diligence defense, but only in a highly cursory fashion and at a high level of abstraction. Nowhere is there any discussion specifically analyzing or applying those laws to the Bank's specific conduct or circumstances. The Document does not impart any legal advice about the legality of the Bank's existing policies, nor does it propose alternative policies that should be implemented to bring the Bank's practices into compliance with the law. The Bank has made no showing to support the conclusion that the Document was disseminated solely to individuals who were responsible for formulating, implementing and monitoring the Bank's policies (and, from its face, it is clear it was not). Furthermore, in the main the Document's content does not differ substantially from the content of the larger Due Diligence Manual, both of which discuss the securities laws, underwriter liability and the due diligence defense. Where, like here, an attorney merely communicates the state of the law in the abstract without any analysis or reference to the client's confidential information, it does not constitute privileged "legal advice" within the meaning of the attorney-client privilege.

Because the Bank cannot put forth sufficient evidence to sustain their assertion of privilege, the Court should deny the Bank's requested relief. *Kingsway Financial Services, Inc. v. Pricewaterhouse-Coopers LLP*, 03 Civ. 5560, 2007 U.S. Dist. LEXIS 11349 (S.D.N.Y. Feb. 14, 2007) (requiring the production of documents withheld on the basis of privilege because proponent failed to offer any evidence to sustain privilege).

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Honorable Lewis A. Kaplan
July 5, 2007
Page 11

### III.  The Bank Failed to "Jealously Protect" its Claim of Privilege.

Even when the initial disclosure of privileged documents is involuntary, waiver may nevertheless result if the party asserting the privilege fails to take steps "'reasonably designed' to protect and preserve the privilege." *United States v. de la Jara*, 973 F.2d 746, 750 (9th Cir. 1992), citing *Transamerica Computer Co., Inc. v. Int'l Bus. Mach. Corp.*, 573 F.2d 646, 650 (9th Cir. 1978). The attorney-client privilege "must be jealously guarded by the holder of the privilege lest it be waived . . . [because] [t]he courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *In re Sealed Case*, 278 U.S. App. D.C. 188, 877 F.2d 976, 980 (D.C. Cir. 1989). *See also In re Parmalat Securities Litig.*, 04-MD-1653, Mem. & Order, at p.11 (December 1, 2006) (Pitman, M.J.) (citing authorities). Nor is a protective order standing alone sufficient safeguard; rather, a proponent of privilege must still take reasonable steps pursuant to any such protective order to enforce the claim of privilege and to safeguard the confidentiality of the communication at issue. *See Kingsway Financial Servs., Inc. v. Price-Waterhouse-Coopers, LLP*, 03 Civ. 5560, 2007 U.S. Dist. LEXIS 46660, at * 1-2, 6-8 (S.D.N.Y. June 27, 2007) (Pitman, J.) (second disclosure following invocation of protective order's inadvertent production clause waived privilege). In determining whether a waiver was effected after an inadvertent disclosure, the Courts consider: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the time taken to rectify the error, (3) the scope of the discovery and extent of the disclosure, and (4) the overarching consideration of fairness. *SEC v. Cassano*, 189 F.R.D. 83, 85 (S.D.N.Y. 1999). Here, the Bank failed to zealously guard its claim of privilege, and all these factors weigh in favor of rejecting its assertion of privilege.

The evidence shows that the Bank did not pursue reasonable means to protect and preserve the confidentiality of the alleged privileged Document. First, after (mistakenly) identifying the Document as privileged and inadvertently disclosed, the Bank did not even bother to remove it from its own production; it then went ahead three weeks later and produced it directly to Hartford Life. Second, it was produced in at least two different places in its production to all of the MDL parties. Third, it made no focused, organized effort to ensure that the scores of recipients acknowledged the Bank's privilege claim and "returned" it pursuant to the Stipulated Protective Order. And, fourth, as a direct consequence of the Bank's lack of effort, the document remained posted on the FTP website for almost *four months*. Even on a generous reading of this litany of carelessness, the only common sense conclusion is that, with the horse well out of the barn, the Bank has waived any privilege it thought it had. *See Eigenheim Bank v. Halpern*, 598 F. Supp. 988 (S.D.N.Y. 1984) (holding privilege waived when a privileged document was disclosed on two separate occasions). *See also Kingsway Financial Servs., supra*, 2007 U.S. Dist. LEXIS 46660, at * 6-8 (second disclosure following claim of privilege effected waiver).

The Bank's half-hearted attempt to assert "inadvertent production" sums up this point. Simply writing a mass email with no request for a reply or other acknowledgment and no effort to ensure that it was even received by the parties just does not arise to a level of reasonable

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Honorable Lewis A. Kaplan
July 5, 2007
Page 12

protection of the privilege. *In re Philip Services Corp. Securities Litigation*, 98 Civ. 0835, 2005 U.S. Dist. LEXIS 22998, *11 (S.D.N.Y. Oct. 7, 2005) ("mere letter writing was not a sufficient step by [party claiming privilege] to protect its claimed privilege"). The Bank should have requested that all parties respond to the February 17, 2007 email and it should have kept a record of all parties who acknowledged receipt and indicated voluntary compliance. Furthermore, the Bank should have checked any sources where the Document was accessible to the parties in the MDL litigation, like the FTP website, to ensure that it was no longer being disclosed. Incredibly, the Bank sat idly by for months (until June 2007) after it first learned (in February 2007) that the Document was posted on the FTP website before checking and eventually demanding again that the Document be removed. Such delay constitutes waiver. *SEC v. Cassano*, 189 F.R.D. 83, 86 (S.D.N.Y. 1999) ("Although SEC acted promptly once it determined that the document had been produced . . . the time taken to rectify the error, in all the circumstances, was excessive. There was no excuse for waiting 12 days to find out what the document was.").

Finally, on these facts, there are no overarching concerns of fairness that weigh in favor of upholding the privilege, especially given the business nature of the Document and in light of the fact that, as discussed below, the Document has been put at issue in this case. *Local 851 of the Int'l Bhd. of Teamsters v. Kuehne & Nagel, Inc.*, 36 F. Supp. 2d 127 (E.D.N.Y. 1998) (overarching issues of fairness weighed in favor of a waiver when the privileged communication had been put at issue).

**IV.   The At-Issue Waiver Doctrine Also Negates the Bank's Privilege Claim.**

The Bank waived any attorney-client privilege that could even arguably apply to the Document because the Bank has affirmatively put the contents of the Document at issue in this litigation. It is well-settled that a defendant may not use the substance of documents as a sword in raising an affirmative defense while at the same time invoking the privilege as a shield to prevent disclosure of the very materials implicated by the affirmative defense it has raised. *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991), *cert. denied*, 502 U.S. 813 (1991) ("The waiver principle is applicable here for Bilzerian's testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue."); *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 488-89 (S.D.N.Y. 1993) ("this waiver principle sweeps more broadly" than just reliance on advice of counsel); *see also In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 469-70 (S.D.N.Y. 1996) (waiver by reliance on expert internal investigative report). Here, the Bank has affirmatively asserted a due diligence defense in this action. Its designated experts offer the opinion that the Bank "performed due diligence that was reasonable and consistent with industry standards." *See* Expert Report of Dr. John W. Peavy, § IV, p. 4. By raising this defense, the Bank has put at issue its understanding of "reasonable" due diligence and of what the "industry standards" are for due diligence. The disclosed Due Diligence Manual and the Slide Show Appendix both have direct bearing on the Bank's understanding of the requirements of the due diligence doctrine, and specifically what is adequate and what is inadequate in the context of this case.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Honorable Lewis A. Kaplan
July 5, 2007
Page 13

The lead decision on this doctrine, *United States v. Bilzerian*, 926 F.2d 1285, 1291-92 (2d Cir.), *cert. denied*, 502 U.S. 813 (1991), requires an "at-issue" waiver on the facts of this case. In *Bilzerian*, the trial court ruled that the defendant would waive the attorney-client privilege by testifying at trial about his good faith attempt to comply with the securities laws even though he did not claim to have relied on any advice of counsel. The Second Circuit affirmed, holding that "a defendant may not use the privilege to prejudice his opponent's case or disclose some selected communications for *self-serving purposes*." *Id.* 1292-94 (emphasis added). Applying the at-issue waiver principle, the appellate court stated:

> [The defendant's] testimony that he thought his actions were legal would have put his knowledge of the law and *the basis for his understanding of what the law required in issue*. His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent.

*Id.* at 1292 (emphasis added).

That same logic compels the same result here. In raising a due diligence defense, the Bank has implicitly claimed that it conducted adequate due diligence, and has thereby put at issue both its knowledge of what adequate due diligence is and the basis for that knowledge (specifically the Due Diligence Manual as informed by the views of its legal counsel). The Bank cannot use the claim (and its expert reports) that it performed adequate due diligence as a sword while shielding the Slide Show Appendix, when this document is an integral part of the manual which sets forth the Bank's own basis for its understanding of what adequate due diligence involves. *Tribune Co., v. Purcigliotti*, 93 Civ. 7222, 1997 U.S. Dist. LEXIS 228, *33-34 (S.D.N.Y. Jan. 10, 1997) ("by defending the adequacy of his efforts in settling the claims, he has placed his conduct at issue, using it as a 'sword,' and therefore cannot rely upon privilege as a 'shield' to preclude further discovery into what he knew and did in defending and settling the claims"). *See also In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 469-70 (S.D.N.Y. 1996) (disclosure of privileged communications in report used to support position in litigation constitutes waiver of the attorney-client privilege); *In re Taxable Mun. Bond Securities Litig.*, Civ. Action MDL 863, 1993 U.S. Dist. LEXIS 11533, at *8-11 (E.D. La. August 16, 1993) (finding at-issue waiver where underwriter defendant's witnesses testified at deposition that the defendant companies "looked to counsel" to "orchestrate the due diligence").

The Bank put its Due Diligence Manual (to which the Slide Show Appendix was incorporated and physically attached) directly at issue since it has produced it in this litigation and its witnesses have referred to it and provided other testimony as to the Bank's due diligence

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Honorable Lewis A. Kaplan
July 5, 2007
Page 14

policy and procedures.[4] The Bank, however has not made a full disclosure; rather, it selectively produced certain portions of the Bank's Due Diligence Manual, while withholding another portion of that very same manual – *i.e.* the Slide Show Appendix – on the basis of privilege. That kind of self-serving, selective production is precisely what the "at issue" waiver doctrine prohibits.

The Slide Show Appendix is not only directly relevant, but is "at issue" on the question of what the Bank knew was adequate (and inadequate) due diligence, as a business matter. Thus, the at-issue waiver doctrine would strip any privilege that could be found to apply in this case.

\* \* \*

For the foregoing reasons, Hartford Life respectfully requests that the Court deny the Bank's requested relief and rule that the Slide Show Appendix is not privileged.

Respectfully submitted,

Michael P. Bowen

Enclosures

cc: Via Email and Overnight Federal Express:
John H. Cobb, Esq. (w/ Encls. and Addendum)
Helms Mulliss Wicker
Attorneys for Defendants

---

[4] *See, e.g.,* Deposition of Colin McClary, August 25, 2006 at pp. 408-411, 443-46, and 513-16; Deposition of Michael W. Lau, September 13, 2006 at pp. 132-150, 178-181, 196-198, 204-213, 217-222, 249-251, 350-351; Deposition of Michael W. Lau, September 14, 2006 at pp. 509-510 and 785-786; Deposition of Michael W. Lau, September 15, 2006 at pp. 902-916, 928-932, 935-937, 992-994, 1032-1034 and 1059-1060. (excerpts are attached as Ex. E).