# Exhibit 1

OFFERING CIRCULAR



# PARMALAT CAPITAL FINANCE LIMITED

*(incorporated in the Cayman Islands with limited liability)*

## U.S.$500,000,000

## 6.625 per cent. Guaranteed Notes due 2008

### Guaranteed by

# PARMALAT S.p.A.

*(incorporated in the Republic of Italy with limited liability)*

---

### Issue Price 99.733 per cent.

---

Application has been made to list the Notes on the Luxembourg Stock Exchange.

Interest on the Notes is payable annually in arrear on the 13th August in each year, with the first payment being on 13th August, 1999. Payments on the Notes will be made without deduction for or on account of taxes of the Cayman Islands or the Republic of Italy to the extent described under "Terms and Conditions of the Notes — Taxation".

The Notes mature on 13th August, 2008. The Notes are subject to redemption in whole, at their principal amount, at the option of the Issuer at any time in the event of certain changes affecting taxes of the Cayman Islands or the Republic of Italy. See "Terms and Conditions of the Notes — Redemption and Purchase".

The Notes will initially be represented by a Temporary Global Note, without interest coupons, which will be deposited with a common depositary on behalf of the Cedel Bank and Euroclear systems on or about 13th August, 1998. The Temporary Global Note will be exchangeable for interests in a Global Note, without interest coupons, on or after a date which is expected to be 22nd September, 1998 upon certification as to non-U.S. beneficial ownership. The Global Note will be exchangeable for definitive Notes in bearer form in the denominations of U.S.$1,000, U.S.$10,000 and U.S.$100,000 each with Coupons attached only in certain limited circumstances. See "Summary of Provisions relating to the Notes while in Global Form".

The Notes have not been admitted, nor has application pursuant to applicable Italian securities laws been made for admittance of the Notes, to trading on the Italian Stock Exchange or listing on Telematico.

## Barclays Capital

| | |
|---|---|
| Banca Commerciale Italiana | |
| Bear, Stearns International Limited | Banque Bruxelles Lambert S.A. |
| Chase Manhattan International Limited | Caboto Holdings SIM |
| Credit Suisse First Boston | Credit Agricole Indosuez |
| Merrill Lynch International | Dresdner Kleinwort Benson |
| Greenwich Natwest | HSBC Markets |
| SG | Paribas |
| | Warburg Dillon Read |

7th August, 1998

*Parmalat Capital Finance Limited (the "Issuer") and Parmalat S.p.A. (the "Guarantor") having made all reasonable enquiries confirm that this document contains all information with respect to the Issuer, the Guarantor, the Guarantor and its subsidiaries taken as a whole (the "Group"), and the U.S.$500,000,000 6.625 per cent. Guaranteed Notes due 2008 (the "Notes") which is material in the context of the issue and offering of the Notes, the statements contained in it relating to the Issuer, the Guarantor and the Group are in every material particular true and accurate and not misleading, the opinions and intentions expressed in this document with regard to the Issuer, the Guarantor and the Group are honestly held, have been reached after considering all relevant circumstances and are based on reasonable assumptions, there are no other facts in relation to the Issuer, the Guarantor, the Group or the Notes the omission of which would, in the context of the issue and offering of the Notes, make any statement in this document misleading in any material respect and all reasonable enquiries have been made by the Issuer and the Guarantor to ascertain such facts and to verify the accuracy of all such information and statements.*

*This Offering Circular does not constitute an offer of or an invitation by or on behalf of the Issuer, the Guarantor or the Managers (as defined in "Subscription and Sale" below) to subscribe or purchase, any of the Notes. The distribution of this Offering Circular and the offering of the Notes in certain jurisdictions may be restricted by law. Persons into whose possession this Offering Circular comes are required by the Issuer, the Guarantor and the Managers to inform themselves about and to observe any such restrictions. For a description of certain further restrictions on offers and sales of Notes and distribution of this Offering Circular, see "Subscription and Sale" below.*

*No person is authorised to give any information or to make any representation not contained in this Offering Circular and any information or representation not so contained must not be relied upon as having been authorised by or on behalf of the Issuer, the Guarantor or the Managers. The delivery of this Offering Circular at any time does not imply that the information contained in it is correct as at any time subsequent to its date.*

*The Notes have not been and will not be registered under the U.S. Securities Act of 1933 (the "Securities Act") and are subject to U.S. tax law requirements. Subject to certain exceptions, Notes may not be offered, sold or delivered within the United States or to U.S. persons.*

*In this Offering Circular, unless otherwise specified or the context otherwise requires, references to "ITL", "LIT", "Lit." and "Lire" are to Italian Lire, and references to U.S.$ are to United States dollars.*

In connection with this issue, Barclays Capital may over-allot or effect transactions which stabilise or maintain the market price of the Notes at a level which might not otherwise prevail. Such stabilising, if commenced, may be discontinued at any time.

HANC 004734

TABLE OF CONTENTS

| | Page |
|---|---|
| Terms and Conditions of the Notes | 4 |
| Summary of Provisions relating to the Notes while in Global Form | 11 |
| Use of Proceeds | 12 |
| Parmalat Capital Finance Limited | 13 |
| Capitalisation of Parmalat Capital Finance Limited | 14 |
| Auditors' Report on Financial Statements of Parmalat Capital Finance Limited | 16 |
| Audited Financial Statements of Parmalat Capital Finance Limited | 17 |
| Parmalat S.p.A. | 22 |
| Other Considerations | 36 |
| Capitalisation of Parmalat S.p.A. | 37 |
| Auditors' Report on Parmalat S.p.A.'s Financial Statements | 38 |
| Summary Audited Non-Consolidated Financial Statements of Parmalat S.p.A. | 39 |
| Auditors' Report on Parmalat S.p.A.'s Consolidated Financial Statements | 43 |
| Summary Audited Consolidated Financial Statements of Parmalat S.p.A. | 44 |
| Taxation | 49 |
| Subscription and Sale | 51 |
| General Information | 53 |

## INCORPORATION BY REFERENCE

Copies of the audited consolidated and non-consolidated financial statements (including the notes thereto) of the Guarantor for the year ended 31st December, 1997 are incorporated by reference in this Offering Circular and are available at the specified office of each of the Paying Agents free of charge as described in **"General Information"** below.

HANC 004735

TERMS AND CONDITIONS OF THE NOTES

The issue of the Notes was authorised by a resolution of the Board of Directors of the Issuer on 5th August, 1998 and the issue of the Guarantees falls within the general powers and authority conferred on the Chairman and Chief Executive Officer of the Guarantor by a resolution of the Board of Directors of the Guarantor made on 26th June, 1998. A fiscal agency agreement dated 13th August, 1998 (the "**Fiscal Agency Agreement**") has been entered into in relation to the Notes between the Issuer, the Guarantor, and Barclays Bank PLC, as fiscal agent. The fiscal agent for the time being is referred to below as the "**Fiscal Agent**" and the Fiscal Agent together with any other paying agents appointed thereunder below as the "**Paying Agents**". The Fiscal Agency Agreement includes the form of the Notes and the coupons relating to them (the "**Coupons**"). Copies of the Fiscal Agency Agreement are available for inspection during normal business hours at the specified offices of the Paying Agents. The holders of the Notes (the "**Noteholders**") and the holders of the Coupons (whether or not attached to them) (the "**Couponholders**") are deemed to have notice of all the provisions of the Fiscal Agency Agreement applicable to them.

1.  **Form, Denomination and Title**

    (a)  **Form and denomination:** The Notes are serially numbered and in bearer form in the denominations of U.S.$1,000, U.S.$10,000 and U.S.$100,000 each with Coupons attached on issue. Notes of one denomination may not be exchanged for Notes of any other denomination.

    (b)  **Title:** Title to the Notes and Coupons passes by delivery. The holder of any Note or Coupon will (except as otherwise required by law) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any interest in it, any writing on it, or its theft or loss) and no person will be liable for so treating the holder.

2.  **Guarantee and Status**

    (a)  **Guarantee:** The Guarantor has unconditionally and irrevocably guaranteed the due payment of all sums expressed to be payable by the Issuer under the Notes and the Coupons. Its obligations in that respect (the "**Guarantees**") are set out on each of the Notes.

    (b)  **Status:** The Notes and Coupons constitute (subject to Condition 3) unsecured obligations of the Issuer and shall at all times rank *pari passu* and without any preference among themselves. The payment obligations of the Issuer under the Notes and Coupons and of the Guarantor under the Guarantees shall, save for such exceptions as may be provided by applicable legislation and subject to Condition 3, at all times rank at least equally with all its/their respective other present and future unsecured and unsubordinated obligations.

3.  **Negative Pledge**

    (a)  So long as any Note or Coupon remains outstanding (as defined in the Fiscal Agency Agreement):

        (i)  neither the Issuer nor the Guarantor will create or permit to subsist any mortgage, charge, pledge, lien or other form of encumbrance or security interest ("**Security**") upon the whole or any part of its undertaking, assets or revenues present or future to secure any Relevant Debt, or any guarantee of or indemnity in respect of any Relevant Debt;

        (ii)  each of the Issuer and the Guarantor will procure that no other person creates or permits to subsist any Security upon the whole or any part of the undertaking, assets or revenues present or future of that other person to secure (x) any of the Issuer's Relevant Debt or the Guarantor's Relevant Debt, or any guarantee of or indemnity in respect of any of the Issuer's Relevant Debt or the Guarantor's Relevant Debt, or (y) where the person in question is a Subsidiary (as defined in the Fiscal Agency Agreement) of the Issuer or of the Guarantor, any of the Relevant Debt of any person other than that Subsidiary, or any guarantee of or indemnity in respect of any such Relevant Debt; and

        (iii)  each of the Issuer and the Guarantor will procure that no person other than the Guarantor gives any guarantee of, or indemnity in respect of, any of its Relevant Debt

        unless, at the same time or prior thereto, the Issuer's obligations under the Notes and the Coupons, or, as the case may be, the Guarantor's obligations under the Guarantees (aa) are secured equally and rateably therewith or benefit from a guarantee or indemnity in substantially identical terms thereto, as the case may be, or (bb) have the benefit of such

4

other security, guarantee, indemnity or other arrangement as shall be approved by an Extraordinary Resolution (as defined in the Fiscal Agency Agreement) of the Noteholders.

(b) For the purpose of these Terms and Conditions, in relation to a company or corporation, "**Subsidiary**" means a company or corporation

(i) which is controlled, directly or indirectly, by the first-mentioned company or corporation; or

(ii) more than half the issued share capital of which is beneficially owned, directly or indirectly, by the first-mentioned company or corporation; or

(iii) which is a subsidiary of another subsidiary of the first-mentioned company or corporation,

and, for these purposes, a company or corporation shall be treated as being controlled by another if that other company or corporation is able to control the composition of its board of directors or equivalent body.

For the purposes of this Condition, "**Relevant Debt**" means any present or future indebtedness in the form of, or represented by, notes, debentures, loan stock or other securities which are for the time being, or are capable of being, quoted, listed or ordinarily dealt in on any stock exchange, over-the-counter or other securities market.

4.   Interest

    The Notes bear interest from 13th August, 1998 at the rate of 6.625 per cent. per annum, payable annually in arrear on 13th August in each year with the first payment of interest, to be made on 13th August, 1999. Each Note will cease to bear interest from the due date for redemption unless, upon due presentation, payment of principal is improperly withheld or refused. In such event it shall continue to bear interest at such rate (both before and after judgment) until whichever is the earlier of (a) the day on which all sums due in respect of such Note up to that day are received by or on behalf of the relevant holder, and (b) the day seven days after the Fiscal Agent has notified Noteholders of receipt of all sums due in respect of all the Notes up to that seventh day (except to the extent that there is failure in the subsequent payment to the relevant holders under these Conditions). If interest is required to be calculated for a period of less than one year, it will be calculated on the basis of a 360-day year consisting of 12 months of 30 days each and, in the case of an incomplete month, the number of days elapsed.

5.   Redemption and Purchase

(a) **Final redemption:** Unless previously redeemed, or purchased and cancelled, the Notes will be redeemed on 13th August, 2008 (the "**Maturity Date**") at 100 per cent. of their principal amount. The Notes may not be redeemed at the option of the Issuer other than in accordance with this Condition 5.

(b) **Redemption for taxation reasons:** The Notes may be redeemed at the option of the Issuer in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable), at their principal amount, if (i) the Issuer (or, if the Guarantees were called, the Guarantor) has or will become obliged to pay additional amounts as provided or referred to in Condition 7 as a result of any change in, or amendment to, the laws or regulations of Italy or the Cayman Islands or any political subdivision or any authority thereof or therein having power to tax, or any change in the application or official interpretation of such laws or regulations, which change or amendment becomes effective on or after 7th August, 1998 and (ii) such obligation cannot be avoided by the Issuer (or the Guarantor, as the case may be) taking reasonable measures available to it, provided that no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer (or the Guarantor, as the case may be) would be obliged to pay such additional amounts were a payment in respect of the Notes (or the Guarantees, as the case may be) then due (ignoring for this purpose the date of actual payment). Prior to the publication of any notice of redemption pursuant to this paragraph, the Issuer shall deliver to the Fiscal Agent a certificate signed by two Directors of the Issuer (or the Guarantor, as the case may be) stating that the Issuer is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Issuer so to redeem have occurred, and an opinion of independent legal advisers of recognised standing to the effect that the Issuer (or the Guarantor, as the case may be) has or will become obliged to pay such additional amounts as a result of such change or amendment.

HANC 004737

(c) **Notice of redemption:** All Notes in respect of which any notice of redemption is given under this Condition shall be redeemed on the date specified in such notice in accordance with this Condition.

(d) **Purchase:** The Issuer and the Guarantor and any of its/their respective Subsidiaries may at any time purchase Notes in the open market or otherwise at any price (provided that they are purchased together with all unmatured Coupons relating to them). Any purchase by tender shall be made available to all Noteholders alike. The Notes so purchased, while held by or on behalf of the Issuer, the Guarantor or any such Subsidiary, shall not entitle the holder to vote at any meetings of the Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorums at meetings of the Noteholders or for the purposes of Condition ll(a).

(e) **Cancellation:** All Notes so redeemed or purchased and any unmatured Coupons attached to or surrendered with them will be cancelled and may not be re-issued or resold.

6. **Payments**

(a) **Method of Payment:** Payments of principal and interest will be made against presentation and surrender (or, in the case of a partial payment, endorsement) of Notes or the appropriate Coupons (as the case may be) at the specified office of any Paying Agent (subject to paragraph (b) below) by U.S. dollar cheque drawn on, or by transfer to a U.S. dollar account maintained by the payee with, a bank in New York City. Payments of interest due in respect of any Note other than on presentation and surrender of matured Coupons shall be made only against presentation and either surrender or endorsement (as appropriate) of the relevant Note.

(b) **U.S. Paying Agent:** Payments of interest in respect of Notes may only be made at the specified offices of Paying Agents outside the United States of America, except that they may be made at the specified office of a Paying Agent in New York City if (i) the Issuer shall have appointed Paying Agents with specified offices outside the United States of America with the reasonable expectation that such Paying Agents would be able to make payment at such offices of the full amount of the interest on the Notes in U.S. dollars when due, (ii) payment of the full amount of such interest at all specified offices of the Paying Agents outside the United States of America is illegal or effectively precluded by exchange controls or other similar restrictions, and (iii) the relevant payment is permitted by applicable U.S. law. If a Note is presented for payment of principal at the specified office of any Paying Agent in the United States of America in circumstances where interest (if any is payable against presentation of the Note) is not to be paid there, the relevant Paying Agent will annotate the Note with the record of the principal paid and return it to the holder for the obtaining of interest elsewhere.

(c) **Payments subject to fiscal laws:** All payments are subject in all cases to any applicable fiscal or other laws and regulations, but without prejudice to the provisions of Condition 7. No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(d) **Surrender of unmatured Coupons:** Each Note should be presented for redemption together with all unmatured Coupons relating to it, failing which the amount of any such missing unmatured Coupon (or, in the case of payment not being made in full, that proportion of the amount of such missing unmatured Coupon which the sum of principal so paid bears to the total principal amount due) will be deducted from the sum due for payment. Each amount of principal so deducted will be paid in the manner mentioned above against surrender of the relevant missing Coupon not later than 10 years after the Relevant Date (as defined in Condition 7) for the relevant payment of principal.

(e) **Payments on business days:** A Note or Coupon may only be presented for payment on a day which is a business day in the place of presentation (and, in the case of payment by transfer to a U.S. dollar account in New York City). No further interest or other payment will be made as a consequence of the day on which the relevant Note or Coupon may be presented for payment under this paragraph falling after the due date. In this Condition "**business day**" means a day on which commercial banks and foreign exchange markets are open in the relevant city.

(f) **Paying Agents:** The initial Paying Agents and their initial specified offices are listed below. The Issuer and the Guarantor reserve the right at any time to vary or terminate the appointment of any Paying Agent and appoint additional or other Paying Agents, provided that it/they will maintain (i) a Fiscal Agent and (ii) Paying Agents having specified offices in at least two major European cities (including Luxembourg, so long as the Notes are listed on the Luxembourg

HANC 004738

Stock Exchange). In addition, the Issuer and the Guarantor shall forthwith appoint a Paying Agent in New York City in the circumstances described in paragraph 6(b) above (if there is no such Paying Agent at the time) and shall after such circumstances arise maintain such a Paying Agent. Notice of any change in the Paying Agents or their specified offices will promptly be given to the Noteholders.

7.  **Taxation**

All payments of principal and interest in respect of the Notes and the Coupons or under the Guarantees shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or within the Cayman Islands or the Republic of Italy or any authority therein or thereof having power to tax, unless such withholding or deduction is required by law. In that event the Issuer or, as the case may be, the Guarantor shall pay such additional amounts as will result in receipt by the Noteholders and the Couponholders of such amounts as would have been received by them had no such withholding or deduction been required, except that no such additional amounts shall be payable in respect of any Note or Coupon presented for payment:

(a)  by or on behalf of a holder who is liable to such taxes, duties, assessments or governmental charges in respect of such Note or Coupon by reason of his having some connection with the Cayman Islands or, in the case of payments made by the Guarantor, the Republic of Italy other than the mere holding of the Note or Coupon; or

(b)  more than 30 days after the Relevant Date except to the extent that the holder of it would have been entitled to such additional amounts on presenting such Note or Coupon for payment on the last day of such period of 30 days.

"**Relevant Date**" means whichever is the later of (i) the date on which such payment first becomes due and (ii) if the full amount payable has not been received by the Fiscal Agent on or prior to such due date, the date on which, the full amount having been so received, notice to that effect shall have been given to the Noteholders. Any reference in these Conditions to any amount payable in respect of the Notes shall be deemed to include any additional amounts which may be payable under this Condition.

8.  **Events of Default**

If any of the following events occurs and is continuing:

(a)  **Non-Payment**: the Issuer fails to pay the principal or any interest on any of the Notes when due and such failure continues for a period of five days; or

(b)  **Breach of Other Obligations**: the Issuer or the Guarantor does not perform or comply with any one or more of its other obligations in the Notes which default is incapable of remedy or is not remedied within 14 days after notice of such default shall have been given to the Issuer or the Guarantor by the Fiscal Agent at its specified office by any Noteholder; or

(c)  **Cross-Default**: (i) any other present or future indebtedness of the Issuer or the Guarantor or any of its/their respective Material Subsidiaries for or in respect of moneys borrowed or raised becomes (or becomes capable of being declared) due and payable prior to its stated maturity otherwise than at the option of the Issuer or, as the case may be, the Guarantor, or (ii) any such indebtedness is not paid when due or, as the case may be, within any applicable grace period, or (iii) the Issuer or the Guarantor or any of its/their respective Material Subsidiaries fails to pay when due any amount payable by it under any present or future guarantee for, or indemnity in respect of, any moneys borrowed or raised provided that the aggregate amount of the relevant indebtedness, guarantees and indemnities in respect of which one or more of the events mentioned above in this paragraph (c) have occurred equals or exceeds ITL10,000,000,000 or its equivalent in other currencies. For the purposes of this Condition "**indebtedness**" shall be construed so as to include, without limitation, any indebtedness of any person for or in respect of:

(i)  amounts raised by acceptance under any acceptance credit facility;

(ii)  amounts raised under any note purchase facility;

(iii)  the amount of any liability in respect of leases or hire purchase contracts which would, in accordance with generally accepted accounting standards, in Italy (as used in the most recent annual, consolidated financial statements of the Group) be treated as finance or capital leases;

7

HANC 004739

    (iv) amounts raised under any other transaction (including, without limitation, any deferred purchase consideration or forward sale or purchase agreement) having the commercial effect of a borrowing; and

    (v) any actual or contingent liability in respect of guarantees issued in favour of banks or financial institutions, any interest rate or foreign exchange contracts or other derivative transactions; or

(d) **Enforcement Proceedings:** a distress, attachment, execution or other legal process is levied, enforced or sued out on or against any part of the property, assets or revenues of the Issuer or the Guarantor or any of its/their respective Material Subsidiaries and is not discharged or stayed within 14 days; or

(e) **Security Enforced:** any mortgage, charge, pledge, lien or other encumbrance, present or future, created or assumed by the Issuer or the Guarantor or any of its/their respective Material Subsidiaries becomes enforceable and any step is taken to enforce it (including the taking of possession or the appointment of a receiver, manager or other similar person); or

(f) **Insolvency:** the Issuer or the Guarantor or any of its/their respective Material Subsidiaries is or is, or could be, deemed by law or a court to be insolvent or bankrupt or unable to pay its debts, stops, suspends or threatens to stop or suspend payment of all or a material part of its debts, proposes or makes any agreement for the deferral, rescheduling or other readjustment of all of its debts (or of any part which it will or might otherwise be unable to pay when due), proposes or makes a general assignment or an arrangement or composition with or for the benefit of the relevant creditors in respect of any of such debts or a moratorium is agreed or declared in respect of or affecting all or any part of (or of a particular type of) the debts of the Issuer, the Guarantor or any of its/their respective Material Subsidiaries; or

(g) **Winding-up:** an order is made or an effective resolution passed for the winding-up or dissolution of the Issuer or the Guarantor or any of its/their respective Material Subsidiaries, or the Issuer or the Guarantor ceases or threatens to cease to carry on all or a material part of its business or operations, except for the purpose of and followed by a reconstruction, amalgamation, reorganisation, merger or consolidation (i) on terms approved by an Extraordinary Resolution of the Noteholders, or (ii) in the case of a Material Subsidiary, whereby the undertaking and assets of the Material Subsidiary are transferred to or otherwise vested in the Issuer or the Guarantor (as the case may be) or another of its Material Subsidiaries; or

(h) **Ownership:** the Guarantor ceases to own more than 50 per cent. of the issued and outstanding ordinary share capital of the Issuer or any of the voting rights thereof are transferred by the Guarantor; or

(i) **Nationalisation:** by or under the authority of any government, the management of the Issuer or the Guarantor or of any of their respective Material Subsidiaries (together the "**Group**") is seized, nationalised, expropriated or compulsorily acquired; or

(j) **Authorisation and Consents:** any action, condition or thing (including the obtaining or effecting of any necessary consent, approval, authorisation, exemption, filing, licence, order, recording or registration) at any time required to be taken, fulfilled or done in order (i) to enable the Issuer and the Guarantor lawfully to enter into, exercise its/their respective rights and perform and comply with its/their respective obligations under the Notes, (ii) to ensure that those obligations are legally binding and enforceable and (iii) to make the Notes admissible in evidence in the courts of the Cayman Islands and the Republic of Italy is not taken, fulfilled or done; or

(k) **Illegality:** it is or will become unlawful for the Issuer or the Guarantor to perform or comply with any one or more of its obligations under any of the Notes; or

(l) **Analogous Events:** any event occurs which under the laws of any relevant jurisdiction has an analogous effect to any of the events referred to in any of the foregoing paragraphs; or

(m) **Guarantee:** the Guarantee is not (or is claimed by the Guarantor not to be) in full force and effect.

then any Note may, by notice in writing given to the Fiscal Agent at its specified office by the holder, be declared immediately due and payable whereupon it shall become immediately due and payable at its principal amount together with accrued interest without further formality.

HANC 004740

For the purposes of this Condition "Material Subsidiary" means, at any particular time, a company which is then directly or indirectly controlled, or more than 50 per cent. of whose issued equity share capital (or equivalent) is then beneficially owned, by the Issuer or the Guarantor and/or one or more of their respective Subsidiaries and which accounts for in excess of 5 per cent. of the consolidated gross assets or revenues for sales and services of the Parmalat Group of companies (as determined from the audited consolidated gross assets or revenues for financial statements of the Parmalat Group). For a company to be "controlled" by another means that the other (whether directly or indirectly and whether by the ownership of share capital, the possession of voting power, contract or otherwise) has the power to appoint and/or remove all or the majority of the members of the Board of Directors or other governing body of that company.

### 9.  Prescription

Claims in respect of principal and interest will become void unless presentation for payment is made as required by Condition 6 within a period of 10 years in the case of principal and five years in the case of default interest from the appropriate Relevant Date.

### 10.  Replacement of Notes and Coupons

If any Note or Coupon is lost, stolen, mutilated, defaced or destroyed it may be replaced at the specified office of the Fiscal Agent subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Issuer and the Guarantor may require (provided that the requirement is reasonable in the light of prevailing market practice). Mutilated or defaced Notes or Coupons must be surrendered before replacements will be issued.

### 11.  Meetings of Noteholders and Modification

(a)  **Meetings of Noteholders:** The Fiscal Agency Agreement contains provisions for convening meetings of Noteholders to consider matters affecting their interests, including the sanctioning by Extraordinary Resolution of a modification of any of these Conditions. Such a meeting may be convened by Noteholders holding not less than 10 per cent. in principal amount of the Notes for the time being outstanding. The quorum for any meeting convened to consider an Extraordinary Resolution will be two or more persons holding or representing a clear majority in principal amount of the Notes for the time being outstanding, or at any adjourned meeting two or more persons being or representing Noteholders whatever the principal amount of the Notes held or represented, unless the business of such meeting includes consideration of proposals, *inter alia*, (i) to modify the maturity of the Notes or the dates on which interest is payable in respect of the Notes, (ii) to reduce or cancel the principal amount of or interest on the Notes, (iii) to change the currency of payment of the Notes or the Coupons, (iv) to modify the provisions concerning the quorum required at any meeting of Noteholders or the majority required to pass an Extraordinary Resolution, or (v) to modify or cancel the Guarantees, in which case the necessary quorum will be two or more persons holding or representing not less than 75 per cent., or at any adjourned meeting not less than 25 per cent., in principal amount of the Notes for the time being outstanding. Any Extraordinary Resolution duly passed shall be binding on Noteholders (whether or not they were present at the meeting at which such resolution was passed) and on all Couponholders.

(b)  **Modification of Fiscal Agency Agreement:** The Issuer and the Guarantor shall only permit any modification of, or any waiver or authorisation of any breach or proposed breach of or any failure to comply with, the Fiscal Agency Agreement, if to do so could not reasonably be expected to be prejudicial to the interests of the Noteholders.

### 12.  Further Issues

The Issuer may from time to time without the consent of the Noteholders or Couponholders create and issue further securities either having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest on them) and so that such further issue shall be consolidated and form a single series with the outstanding securities of any series (including the Notes) or upon such terms as the Issuer may determine at the time of their issue. References in these Conditions to the Notes include (unless the context requires otherwise) any other securities issued pursuant to this Condition and forming a single series with the Notes.

9

HANC 004741

### 13. Notices

Notices to Noteholders will be valid if published in a leading newspaper having general circulation in London (which is expected to be the *Financial Times*) and (so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of that Stock Exchange so require) in a leading newspaper having general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*) or, if such publication shall not be practicable, in an English language newspaper of general circulation in Europe. Any such notice shall be deemed to have been given on the date of such publication or, if published more than once or on different dates, on the first date on which publication is made. Couponholders will be deemed for all purposes to have notice of the contents of any notice given to the Noteholders in accordance with this Condition.

### 14. Currency Indemnity

The currency of account and payment for all sums payable by the Issuer or the Guarantor under or in connection with the Notes or the Coupons, including damages is U.S. dollars. Any amount received or recovered in a currency other than U.S. dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer or the Guarantor or otherwise) by any Noteholder or Couponholder in respect of any sum expressed to be due to it from the Issuer or Guarantor shall only constitute a discharge to the Issuer and Guarantor to the extent of the amount in U.S. dollars which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that amount in U.S. dollars is less than the amount in U.S. dollars expressed to be due to the recipient under any Note or Coupon, the Issuer or the Guarantor (as the case may be) shall indemnify it against any loss sustained by it as a result. In any event, the Issuer or the Guarantor (as the case may be) shall indemnify the recipient against the cost of making any such purchase. For the purposes of this Condition, it will be sufficient for the Noteholder or the Couponholder, as the case may be, to demonstrate that it would have suffered a loss had an actual purchase been made. These indemnities constitute a separate and independent obligation from the Issuer's and Guarantor's other obligations, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Noteholder or Couponholder and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or Coupon or any other judgment or order. For the avoidance of doubt, nothing in this Condition shall make the Issuer or, as the case may be, the Guarantor liable to indemnify any Noteholder or Couponholder more than once in respect of the same cost, loss or damage.

### 15. Governing Law

(a) **Governing Law:** The Fiscal Agency Agreement, the Notes and the Coupons are governed by and shall be construed in accordance with English law.

(b) **Jurisdiction:** The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with the Notes, the Coupons or the. Guarantees and accordingly any legal action or proceedings arising out of or in connection with the Notes, the Coupons or the Guarantees ("Proceedings") may be brought in such courts. Each of the Issuer and the Guarantor irrevocably submits to the jurisdiction of such courts and waives any objection to Proceedings in any such courts whether on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. These submissions are made for the benefit of the Noteholders and Couponholders and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).

(c) **Agent for Service of Process:** Each of the Issuer and the Guarantor irrevocably appoints SISEC Ltd. of 21 Holborn Viaduct, London EC1A 2DY as its agent in England to receive service of process in any Proceedings in England based on any of the Notes, the Coupons or the Guarantees. If for any reason the Issuer or the Guarantor, as the case may be, does not have such an agent in England, it will promptly appoint a substitute process agent and notify the Noteholders of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

HANC 004742

SUMMARY OF PROVISIONS RELATING TO THE NOTES WHILE IN GLOBAL FORM

The Temporary Global Note and the Global Note contain provisions which apply to the Notes while they are in global form, some of which modify the effect of the terms and conditions of the Notes set out in this document. The following is a summary of certain of those provisions:

### 1. Exchange

The Temporary Global Note is exchangeable in whole or in part for interests in the Global Note on or after a date which is expected to be 22nd September, 1998 upon certification as to non-U.S. beneficial ownership in the form set out in the Temporary Global Note. The Global Note is exchangeable in whole but not, except as provided in the next paragraph, in part (free of charge to the holder) for the Definitive Notes described below (i) if the Global Note is held on behalf of a clearing system and such clearing system is closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or announces an intention permanently to cease business or does in fact do so, (ii) if principal in respect of any Notes is not paid when due and payable or (iii) if the Issuer would suffer a material disadvantage in respect of the Notes as a result of a change in the laws or regulations (taxation or otherwise) of any jurisdiction referred to in Condition 7 which would not be suffered were the Notes in definitive form and a certificate to such effect signed by two Directors of the Issuer is delivered to the Fiscal Agent for display to Noteholders (unless a default notice has been given as referred to in "Default" below). Thereupon (in the case of (i) and (ii) above) the holder may give notice to the Fiscal Agent, and (in the case of (iii) above) the Issuer may give notice to the Fiscal Agent and the Noteholders, of its intention to exchange the Global Note for Definitive Notes on or after the Exchange Date specified in the notice.

If principal in respect of any Notes is not paid when due and payable the holder of the Global Note may by notice to the Fiscal Agent (which may but need not be the default notice referred to in "Default" below) require the exchange of a specified principal amount of the Global Note (which may be equal to or (provided that, if the Global Note is held by or on behalf of a clearing system, that clearing system agrees) less than the outstanding principal amount of Notes represented thereby) for Definitive Notes on or after the Exchange Date (as defined below) specified in such notice.

On or after any Exchange Date (as defined below) the holder of the Global Note may surrender the Global Note or, in the case of a partial exchange, present it for endorsement to or to the order of the Fiscal Agent. In exchange for the Global Note, or the part thereof to be exchanged, the Issuer will deliver, or procure the delivery of, an equal aggregate principal amount of duly executed and authenticated Definitive Notes security printed in accordance with any applicable legal and stock exchange requirements and in or substantially in the form set out in Schedule 1 to the Fiscal Agency Agreement. On exchange in full of the Global Note, the Issuer will, if the holder so requests, procure that it is cancelled and returned to the holder together with any relevant Definitive Notes.

"**Exchange Date**" means a day falling not less than 60 days, or in the case of exchange pursuant to (ii) above 30 days, after that on which the notice requiring exchange is given and on which banks are open for business in the city in which the specified office of the Fiscal Agent is located and, except in the case of exchange pursuant to (i) above, in the cities in which the relevant clearing system is located.

### 2. Payments

No payment will be made on the Temporary Global Note unless exchange for an interest in the Global Note is improperly withheld or refused. Payments of principal and interest in respect of Notes represented by the Global Note will be made against presentation for endorsement and, if no further payment falls to be made in respect of the Notes, surrender of the Global Note to or to the order of the Fiscal Agent or such other Paying Agent as shall have been notified to the Noteholders for such purpose. A record of each payment so made will be endorsed in the appropriate schedule to the Global Note, which endorsement will be prima facie evidence that such payment has been made in respect of the Notes.

### 3. Notices

So long as the Notes are represented by the Global Note and the Global Note is held on behalf of a clearing system, notices to Noteholders may be given by delivery of the relevant notice to that clearing system for communication by it to entitled accountholders in substitution for publication as required by the Conditions except that so long as the Notes are listed on the Luxembourg Stock Exchange and the rules of that Exchange so require, notices shall also be published in a leading newspaper having general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*).

11

4.  Prescription

~~Claims against the Issuer in respect of principal and interest of the Notes while the Notes are~~ represented by the Global Note will become void unless it is presented for payment within a period of 10 years (in the case of principal) and five years (in the case of interest) from the appropriate Relevant Date (as defined in Condition 7).

5.  Meetings

The holder of the Global Note will be treated as being two persons for the purposes of any quorum requirements of, or the right to demand a poll at, a meeting of Noteholders and, at any such meeting, as having one vote in respect of each U.S.$1,000 principal amount of Notes for which the Global Note may be exchanged.

6.  Purchase and Cancellation

Cancellation of any Note required by the Conditions to be cancelled following its purchase will be effected by reduction in the principal amount of the Global Note.

7.  Default

The Global Note provides that the holder may cause the Global Note or a portion of it to become due and payable in the circumstances described in Condition 8 by stating in the notice to the Fiscal Agent the principal amount of Notes which is being declared due and payable. If principal in respect of any Note is not paid when due and payable, the holder of the Global Note may elect that the Global Note becomes void as to a specified portion and that the persons entitled to such portion as accountholders with a clearing system acquire direct enforcement rights against the Issuer under further provisions of the Global Note executed by the Issuer as a deed poll.

## USE OF PROCEEDS

The net proceeds of the issue of the Notes, expected to amount to approximately U.S.$496,635,000, will be on-lent by the Issuer to, or invested by the Issuer in, other companies within the Group for use by such companies for their general corporate purposes.

12

HANC 004744

PARMALAT CAPITAL FINANCE LIMITED

General

*The Issuer is a wholly owned subsidiary of the Guarantor and has no operating history other than the issue of preference shares and the Notes.*

### History and Business

The Issuer was incorporated in George Town, Grand Cayman (with registered number 77240) on 24th October, 1997 for an unlimited duration and with limited liability as an Exempted Company under the laws of the Cayman Islands.

The registered office of the Issuer is at Ugland House, South Church Street, PO Box 309, George Town, Grand Cayman, Cayman Islands. The Issuer has no place of business in Italy or the United Kingdom.

The Issuer is a financial vehicle of the Guarantor and has no other operations.

### Share Capital

(a) The existing issued ordinary shares are not listed on any stock exchange and are not dealt in on any other recognised market.

(b) The authorised share capital of the Company is as follows:

    (i) Italian Lire 251,000,000,000 divided into 5,000,000 Series A Italian Lire Floating Rate Guaranteed preference shares of Italian Lire 500 par value each and 20,000 undesignated preference shares of Italian Lire 50,000 par value each;

    (ii) U.S.\$400,000,100 divided into 100 ordinary shares of US\$1 par value each, 8,000,000 Series B U.S.\$ Floating Rate Guaranteed preference shares of US\$25 par value each and 8,000,000 undesignated preference shares of US\$25 par value each;

    (iii) £100,000,000 divided into 100,000,000 Series C Sterling 9.375 per cent. Guaranteed preference shares of £1 par value each; and

    (iv) ECU125,000,000 divided into 1,250,000 Series D ECU Floating Rate Guaranteed preference shares of ECU100 par value each.

One hundred ordinary shares were issued and fully paid on 10th November, 1997 to the Guarantor. The Issuer has made the following issues:

    (i) 3,000,000 Series A Italian Lire Floating Rate Guaranteed Preference Shares on 2nd December, 1997;

    (ii) 4,000,000 Series B U.S.\$ Floating Rate Guaranteed Preference Shares on 2nd December, 1997;

    (iii) 100,000,000 Series C Sterling 9.375 per cent. Guaranteed Preference Shares on 2nd December, 1997;

    (iv) 1,000,000 Series A Italian Lire Floating Rate Guaranteed Preference Shares (to be fungible with the existing Series A Italian Lire Floating Rate Guaranteed Preference Shares) on 28th May, 1998; and

    (v) 1,250,000 Series D ECU Floating Rate Guaranteed Preference Shares on 28th May, 1998.

The preference shares described in paragraphs (iv) and (v) above are the "New Preference Shares".

Save for the issue of the New Preference Shares there has been no other change in the share capital of the Issuer since 31st December, 1997.

(c) The holder of the ordinary shares in the Issuer has no rights of pre-emption or preferential subscription rights in respect of any of the preference shares.

(d) No capital of the Issuer is under option or is agreed conditionally or unconditionally to be put under option.

13

HANC 004745

CAPITALISATION OF PARMALAT CAPITAL FINANCE LIMITED

The table below sets forth the capitalisation of the Issuer, prepared at 31st December, 1997:

|  | At 31st December, 1997 | |
| --- | ---: | ---: |
|  | Actual U.S.$ | As adjusted[3] U.S.$ |
| Cash, cash equivalent and marketable securities ..................................... | 247,451,145 | 916,735,646 |
| Short-term debt[1] ............................................................... | 7,204,992 | 7,204,992 |
| Long-term debt.................................................................. | 0 | 500,000,000 |
| Total debt ..................................................................... | 7,204,992 | 507,204,992 |
| **Shareholders' equity:** | | |
| Share capital................................................................... | 100 | 100 |
| Preference Shares[3] ............................................................ | 354,980,014 | 524,264,515 |
| Retained earnings .............................................................. | 1,541,256 | 1,541,256 |
| Total shareholders' equity ...................................................... | 356,521,370 | 525,805,771 |
| **Total capitalisation[2]** .......................................................... | 363,726,362 | 1,033,010,763 |

(1)  Figures include current portion of long-term debt.

(2)  Includes short-term debt, long term debt, and total shareholders' equity.

(3)  The "As Adjusted" figures reflect the issue of the New Preference Shares and the issue of U.S.$500,000,000 6.625 per cent. Guaranteed Notes due 2008. The translation of Lire into U.S. dollars has been made at a rate of Lit. 1,734=$1.00 on 26th May, 1998. The translation of ECU into U.S. dollars has been made at the rate of ECU 1.00=U.S.$0.89 on 26th May, 1998.

With the exception of the issue of the New Preference Shares and the issue of U.S.$500,000,000 6.625 per cent. Guaranteed Notes due 2008 (the "Notes") there has been no material change in the capitalisation of Parmalat Capital Finance Limited since 31st December, 1997.

**Indebtedness**

With the exception of the issue of the Notes since the date of its incorporation, the Issuer has not had outstanding any loan capital and has not incurred any other borrowings or indebtedness in the nature of borrowings and has had no contingent liabilities and has granted no guarantees.

**Dividend Details**

The following dividends have been paid in respect of the 3,000,000 Series A Italian Lire Floating Rate Guaranteed Preference Shares and the 4,000,000 Series B U.S.$ Floating Rate Guaranteed Preference Shares issued by the Issuer on 2nd December, 1997:

|  | Shares | Currency | Amount per share | Total amount | Date |
| --- | ---: | :---: | ---: | ---: | :---: |
| Series A ............................ | 3,000,000 | Lit. | 1,047 | 6,327,000,000 | 2nd June, 1998 |
| Series B............................. | 4,000,000 | U.S.$ | 0.51 | 4,080,000 | 2nd June, 1998 |
| Series C ............................ | Will be payable annually, commencing on 2nd December, 1998 | | | | |

Dividends on the New Preference Share are due to be paid on 2nd September, 1998.

14

HANC 004746

**Directors**

The Directors of the Issuer are as follows:

| Name | Function in the Issuer |
| --- | --- |
| Fausto Tonna | Chairman |
| Andrea Petrucci | Director |
| Luciano Del Soldato | Director |

The business address of each Director is Via O. Grassi, 26, 43044 Collecchio (Parma).

**General**

(a) Since 31st December, 1997, the date of the latest balance sheet of the Issuer, there has been no significant change in the trading or financial position of the Issuer, other than the issue of New Preference Shares and the Notes.

(b) Grant Thornton, SpA, Milan, Italy, have been appointed as auditors to the Issuer.

HANC 004747

AUDITORS' REPORT ON FINANCIAL STATEMENTS OF
PARMALAT CAPITAL FINANCE LIMITED

Revisione e                          Grant Thornton S.p.A
Organizzazione Contabile
The Italian Member Firm of
Grant Thornton International

### Auditors' report

"To the Shareholders of:
Parmalat Capital Finance Limited
Ugland House
South Church Street
PO Box 309
George Town
Grand Cayman
Cayman Islands

We have audited the accompanying Balance Sheet of Parmalat Capital Finance Limited as at 31st December, 1997, and the related Statements of Income and cash flows for the period 24th October, 1997 to 31st December, 1997. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

Our examination was made in accordance with generally accepted auditing standards and included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the accompanying financial statements give a true and fair view of the financial position of Parmalat Capital Finance Limited as at 31st December, 1997 and of the results of its operations and its cash flows for the period then ended in accordance with International Accounting Standards (I.A.S.).

Milan, 18th May, 1998                                    Grant Thornton S.p.A.

                                                         Maurizio Bianchi
                                                         Partner"

16

HANC 004748

PARMALAT CAPITAL FINANCE LIMITED

Balance Sheets

| | Notes | As at 31st December, 1997 |
|---|---|---|
| | | *(In U.S.$)* |
| **Current assets:** | | |
| Cash and cash equivalents | (1) | 247,451,145 |
| Accounts receivable from group companies | (2) | 260,990 |
| Total current assets | | 247,712,135 |
| **Non current assets:** | | |
| Accounts receivable from group companies | (2) | 93,742,317 |
| Intangible assets | (3) | 22,271,910 |
| Total non current assets | | 116,014,227 |
| **Total assets** | | 363,726,362 |
| **Current liabilities:** | | |
| Accounts payable from parent company | (4) | 7,204,992 |
| Total current liabilities | | 7,204,992 |
| **Non current liabilities:** | | |
| Long-term loans | | 0 |
| Total non current liabilities | | 0 |
| **Total liabilities** | | 7,204,992 |
| **Shareholders' equity:** | | |
| Share Capital | | 100 |
| Guaranteed Preference Shares | (5) | 354,980,014 |
| Retained earnings | | 1,541,256 |
| Total shareholders' equity | | 356,521,370 |
| **Total liabilities and shareholders' equity** | | 363,726,362 |

See accompanying notes to financial statements.

HANC 004749

Income Statements

|  | Notes | For the period 24th October to 31st December, 1997 |
|---|---|---|
|  |  | (In U.S. $) |
| Net sales | | 0 |
| Other income | | 0 |
| Total sales and other income | | 0 |
| Cost of goods sold | | 0 |
| Staff costs | | 0 |
| Commercial, distribution and marketing cost | | 0 |
| General overheads | | 0 |
| Other provisions | | 0 |
| Gross operating income | | 0 |
| Depreciation and amortisation | (6) | (93,188) |
| Net operating income | | (93,188) |
| Net financial expenses | (7) | 1,634,444 |
| Other financial and non recurrent items | | 0 |
| Total net financial expenses | | 1,634,444 |
| Income before income taxes | | 1,541,256 |
| Income taxes | | 0 |
| Net income | | 1,541,256 |

See accompanying notes to financial statements.

18

HANC 004750

Cash Flows Statement

|  | For the period 24th October to 31st December 1997 |
|---|---|
|  | (In U.S.$) |
| **Cash flows from operating activities** |  |
| Net profit before income taxes | 1,541,256 |
| Adjustment for amortisation | 93,188 |
| Operating profit before working capital changes | 1,634,444 |
| Increase in accounts receivables | (260,990) |
| Increase in payable to parent company | 7,204,992 |
| Net cash from operating activities | 8,578,446 |
| **Cash flows from investing activities** |  |
| Purchase of intangible assets | (22,365,098) |
| Receivables from group companies | (93,742,317) |
| Net cash used in investing activities | (116,107,415) |
| **Cash flows from financing activities** |  |
| Proceeds from issuance of common shares | 100 |
| Proceeds from issuance of preference shares | 354,980,014 |
| Net cash used in financing activities | 354,980,114 |
| Net increase in cash and cash equivalent | 247,451,145 |
| Cash and cash equivalents at beginning of the period | 0 |
| Cash and cash equivalents at end of the period | 247,451,145 |

See accompanying notes to financial statements

19

HANC 004751

ACCOUNTING PRINCIPLES AND NOTES TO FINANCIAL STATEMENTS

**General**

The Issuer was incorporated in George Town, Grand Cayman on 24th October, 1997 for an unlimited duration and with limited liability as an Exempted Company under the laws of the Cayman Islands.

The financial statements were prepared on the basis of accrual accounting, under a conservative approach. Revenue and expenses are recognised when earned and incurred; unrealised losses, but not gains, are recognised if they are both probable and can be reasonably estimated.

*(1) Cash and cash equivalent*

It refers to the bank accounts.

|  | Lit. | U.S.$ |
|---|---|---|
| Credito Italiano c/c n. 82926 in Lit ..................................... | 424,848,557,733 | 244,868,224 |
| Credito Italiano c/c n. 21000 in U.S.$ .................................. |  | 2,582,921 |
| Total ............................................................................ |  | 247,451,145 |

*(2) Accounts Receivables from Group companies*

|  | U.S.$ Within 12 months | U.S.$ Beyond than 12 months |
|---|---|---|
| Curcastle Corporation .................................................... | 260,990 | 93,742,317 |

*(3) Intangible assets*

Intangible assets, including deferred charges, have been recognised at cost and amortised in 20 years. Intangible assets consist of organisation costs of the Guaranteed Preference Shares.

*(4) Accounts payable from parent company*

Accounts payable is reported at the nominal value and consist of the commissions billed by the Guarantor (Parmalat S.p.A.).

*(5) Guaranteed Preference Shares*

The preference shares have been offered in offshore transactions outside the United States to non U.S. persons as defined in, and in reliance on, Regulation S under the Securities Act and to qualified institutional buyers in the United States in reliance on Rule 144A under the Securities Act.

Details:

|  | Total | U.S.$ |
|---|---|---|
| 3,000,000 Series A Italian Lire Floating Rate Guaranteed Preference Shares, each with a par value and a liquidation preference of Lit. 50,0000............................................. | Lit.150,000,000,000 | 86,460,214 |
| 4,000,000 Series B U.S. Dollar Floating Rate Guaranteed Preference Shares, each with a par value and a liquidation preference of U.S.$ 25.00 ............................................. | U.S.$100,000,000 | 100,000,000 |
| 100,000,000 Series C Sterling 9.375 per cent. Guaranteed Preference Shares, each with a par value and a liquidation preference of £1.00 ....................... ......................... | £100,000,000 | 168,519,800 |
| Total ............................................................. ................. |  | 354,980,014 |

*(6) Depreciation and amortisation*

Income and expenses have been recognised in accordance with accrual basis accounting principles and consist of the 5 per cent. (year amortisation) of the gross Intangible assets.

20

HANC 004752

*( 7 )  Net financial expenses*

Net financial expenses consist of the following:

|  | U.S.$ |
|---|---|
| Income from group companies | 260,990 |
| Income from others (banks) | 1,373,523 |
| Financial expenses from others | (69) |
| Total | 1,634,444 |

HANC 004753

### Ownership and Structure

The origins of the Parmalat group date back to 1961 when Calisto Tanzi created Dietelat Srl in order to enter the market of pasteurized milk, which, at that time, was dominated by public dairies. In 1968 Dietelat Srl changed its name to Parmalat Srl ("Parmalat" or the "Company") and in 1973 Parmalat became a joint stock company. In 1990, 75 per cent. of Parmalat's capital was acquired by Finanziaria Centro Nord, a holding company of the Tanzi family, which subsequently changed its name to Parmalat Finanziaria S.p.A. ("Finanziaria").

During 1993, Finanziaria acquired from the Tanzi family a further 20.54 per cent. of Parmalat shares, raising its participation to 95.54 per cent. of Parmalat's voting capital; ownership reached 100 per cent. by the end of 1994. Parmalat S.p.A., the main operating company in the Italian market and the holding company for most of the group's operating and commercial subsidiaries in Italy and abroad, is Finanziaria's principal investment. Finanziaria also owns 75.1 per cent. of Parmalat Canada Inc., the entity through which Parmalat's Canadian activities are held, the balance of the shares being owned by Citicorp North America Inc.

On 12th March, 1998, Parmalat Capital Netherlands B.V. issued Euro 281,200,000 of convertible bonds, convertible into ordinary shares of Finanziaria, listed on the Luxembourg Stock Exchange.



### History and Strategy

Since 1961, Parmalat has grown from a small family-run milk company to one of the largest dairy companies in Italy. During the 1960s the Company's product line consisted purely of UHT milk and cream sold on the Italian market. Its initial growth was due to the success of the long-preservation milk (UHT—Ultra High Temperature), which was sold in carton packages (Tetra Brik containers) rather than in traditional glass bottles. Subsequently Parmalat started distributing UHT creams, ready-to-use bechamel sauce (the "Chef" line) and fresh yoghurt. During the late 1970s and 1980s, Parmalat diversified its product portfolio in order to achieve economies of scale in its processing and packaging technology and the nationwide distribution network established for its UHT milk. During 1981 and 1982 Parmalat entered the vegetable-based products market with fruit juices and strained tomatoes which use the same packaging machinery and same distribution network as Parmalat's UHT milk. In 1984, Parmalat entered the bakery products market, manufacturing biscuits, cookies and snacks.

The Company started to diversify geographically in 1974 in South America with its partnership with Laticinios Mococa in Brazil which continued until 1977, when the joint venture company became a wholly-owned subsidiary of Parmalat. Until 1991 Parmalat's growth was concentrated on the Italian market and achieved internally, without recourse to acquisitions. Key success factors were its leadership in the processing of UHT milk and other UHT products, its extensive distribution network and its intensive advertising efforts, including sponsorship of popular sports, such as World Cup skiing and Formula-One Motor Racing. The Company is currently the owner and sponsor of Parma AC, a team competing in the Italian Serie A soccer league and a sponsor of two Brazilian football clubs.

HANC 004754

In 1992, Parmalat started an aggressive acquisition programme aimed at reinforcing its position in Italy, acquiring market dominance with a branded name, and growing in South America, the United States and Eastern Europe. The main objective was diversification of geographical presence in order to reduce concentration on the Italian market which, in 1991, accounted for 83 per cent. of consolidated net sales. By the end of 1996, Parmalat's sales in South America accounted for 46 per cent. of consolidated net sales and the Italian market accounted for 38.8 per cent. of consolidated net sales. Parmalat has achieved its international growth both organically and through acquisitions. Parmalat has focused on acquiring companies that (i) have significant market share in the geographic area in which they operate, (ii) own production plants locally and (iii) have products similar to those sold by Parmalat. Over the last three years, Parmalat's acquisition strategy has concentrated in South America (especially Brazil and Venezuela), which offer significant opportunities for growth in the future as well as comparatively good margins and where the Parmalat brand name is well established and well recognised. In the Company's view this strategy and its accompanying opportunities outweigh the political, economic, inflation rate, exchange rate and currency control risks that could affect the Group's subsidiaries operating in these countries.

## Capital Expenditure and Acquisitions

With the growth and geographical diversification of Parmalat's activities, increased levels of capital expenditure have been required to improve production capacity and enhance distribution capability. With the growth and geographical diversification of Parmalat's activities, increased levels of capital expenditure and working capital facilities have been required to improve production capacity and enhance the distribution capability. In addition, the Group has had to constantly improve its systems, procedures and controls to manage the higher inventory levels and working capital requirements required to keep pace with the expansion of its operations:

|  | 1997 | 1996 | 1995 | 1994 |
|---|---|---|---|---|
|  | (Lire billion) | | | |
| Capital expenditures | 190 | 134 | 145 | 118 |
| Acquisitions | 97 | 166 | 142 | 104 |
| Total | 287 | 300 | 287 | 222 |

The chart below summarises the acquisitions made by Parmalat from 1st January, 1997 to 31st December, 1997:

| Company | Country | Acquired Share% | Sales* | Cost |
|---|---|---|---|---|
|  |  | (Lire billion) | | |
| Burro Dolomiti srl | Italy | 100.00 | 5 | 3.0 |
| Parmalat Techhold Corp | USA | 51.00 | — | 87.0 |
| Swojas Energy Foods Ltd | India | 50.99 | 7 | 4.0 |
| Centrale del Latte di Busto Arsizio SRL | Italy | 93.75 | 3 | 1.8 |
| F. Ili Strini Costruzioni Meccaniche SRL | Italy | 51.00 | — | 1.4 |
|  |  |  |  | 97.2 |

*Sales refer to the fiscal year ending prior to each acquisition.

The following chart sets forth the evolution of the composition of Parmalat's sales by geographic area during the last five years, in percentage terms:

| Geographic area | 1997 | 1996 | 1995 | 1994 | 1993 |
|---|---|---|---|---|---|
| Europe | 48.45% | 49% | 57% | 64.6% | 72% |
| North America (including Mexico) | 4.44% | 4% | 5% | 4.4% | 4% |
| South America | 46.77% | 46% | 38% | 31.0% | 24% |
| Rest of the World | 0.34% | 1% | —% | —% | —% |
|  | 100% | 100% | 100% | 100% | 100% |

23

HANC 004755

As at 31st December, 1997, Parmalat had 71 plants located in 19 countries, concentrated in Europe and South America. As at 31st December, 1997, the average number of personnel employed by Parmalat was 18,666.

|  | Plants | Employees |
|---|---|---|
| Europe | 28 | 5,005 |
| South America | 34 | 11,815 |
| North America | 4 | 963 |
| Rest of the World | 5 | 883 |
|  | 71 | 18,666 |

## Business

Parmalat's operations are divided into four main divisions: milk products, fresh products, vegetable products and bakery products. The charts below summarise the relative importance of the different geographic areas for the four divisions and the return on sales calculated as net operating profit on sales ("ROS" or "Return on Sales") in relation to each of them for the year ended 31st December, 1997. Comments on market trends, included in the next section, refer to the Italian market unless specified otherwise.

| Sales by Region and Product | Europe | South America | North America | Rest of the World | Total |
|---|---|---|---|---|---|
| Milk products | 1,405 | 1,755 | 186 | 14 | 3,360 |
| Fresh products | 549 | 441 | 13 | 4 | 1,007 |
| Vegetable products | 475 | 224 | 25 | 1 | 725 |
| Bakery products | 236 | 162 | 14 | — | 412 |
| Others | 77 | 64 | 13 | — | 154 |
| Total Revenues 1997 | 2,742 | 2,646 | 251 | 19 | 5,658 |

| ROS* by Product | Total |
|---|---|
| Milk products | 8.8% |
| Fresh products | 8.7% |
| Vegetable products | 8.6% |
| Bakery products | 4.9% |
| Others | 1.3% |
| Total ROS 1997 | 8.3% |

* ROS = Return on Sales, calculated as net operating profit on sales

## Milk products

The division accounted for 59.38 per cent. of Parmalat's consolidated sales worldwide and 63.33 per cent. of consolidated net operating profits in 1997. Return on sales was 8.8 per cent., slightly better than Parmalat's average of 8.3 per cent. Product lines include pasteurised and UHT milk, pasteurised cream and bechamel sauce, milk powder and condensed milk.

In recent years the market for processed milk in the developed countries has generally been characterised by fragmentation and maturity, with few prospects for significant growth, but a fairly stable level of consumption. Product differentiation is difficult, making the possession of an established brand a crucial factor in avoiding purely price-based competition. Markets like Brazil, Latin America in general and, to a lesser extent, Eastern European countries, however, are considered less mature and, therefore, to have better potential for growth. As a result, Parmalat has been positioning itself to take advantage of opportunities in these markets.

In mature markets like Italy, Parmalat's strategy has been focused on milk "diversification" with the introduction of special products and product innovation. Such innovations have included milk with double calcium, added iron and a range of new milk shakes. In 1997 Parmalat acquired the remaining 51.0 per cent.

24

~~of Dasi Corporation, now Parmalat Technologies, that owns a production process which results in UHT milk~~ with an improved taste more closely resembling fresh milk (referred to herein as "New UHT Milk"). Currently New UHT Milk is sold on a limited scale and in limited amounts in certain markets, ~~but Parmalat intends to~~ implement this production process on a wider scale in the future. Parmalat has developed a bottle design and is developing machinery in connection with this product.

Milk and milk-related products still represent the core of Parmalat's activities. According to Nielsen statistics and Parmalat's evaluation the Company is leader in the UHT milk sector in Italy and in Brazil with 35.77 per cent. and 33.0 per cent. of the respective markets in 1997. In addition, according to the Company's own estimates, Parmalat is the market leader for UHT milk in Hungary with a 49.0 per cent. share of the local market.

Parmalat's UHT cream and bechamel products also hold leading market positions in Italy with market shares in 1997 of 43.67 per cent. and 69.1 per cent., respectively (source: Nielsen statistics and Parmalat's evaluation).

### Fresh products

The division accounted for 17.8 per cent. of Parmalat's consolidated sales worldwide and 18.8 per cent. of consolidated net operating profits in 1997. Return on Sales was 8.7 per cent., compared to an average of 8.3 per cent. for the group as a whole. Product lines include yoghurt, desserts, butter and cheeses.

The Italian market for yoghurt has expanded quite rapidly in recent years and is concentrated with approximately 60.0 per cent. of the market covered by three companies. In 1997 Parmalat had a market share of 13.0 per cent. for yoghurt, making it, together with Danone and Yomo, a market leader in Italy. Substantial barriers to entry in the yoghurt market are represented by the refrigerated distribution network which requires substantial capital investment and by the requirement of significant advertising expenditure. Parmalat, Yomo and Danone are the only producers who have a nationwide distribution system for their products.

The market for butter and cheeses in Italy is characterised by the presence of a large number of dairy farms. These produce butter and traditional cheeses which are distributed throughout Italy. While not a strategic focus for Parmalat, the Company has positioned its products towards the upper end of the market and has emphasised the premium quality of its products. In terms of market shares, according to Nielsen and the internal evaluation of Parmalat, Parmalat ranked second in the Italian cream dessert market, accounting for 20.3 per cent. of the market.

### Vegetable products

The division accounted for 12.8 per cent. of Parmalat's consolidated sales worldwide and 13.2 per cent. of consolidated net operating profits in 1997. Return on Sales of 8.6 per cent. was better than the group's average.

The division's product line encompasses fruit juices defined by Italian law as 100 per cent. unfermented juice with no added sugar or water; nectars defined as beverages made from fruit prepared from either pulp, concentrate or puree, sugar and water; and tomato products—defined as strained and chopped tomatoes, iced tea and vegetable purees and soups.

Parmalat's fruit juices are produced from concentrate purchased exclusively from suppliers outside of Italy and their nectars are obtained directly from fruit pulp and juice. This pattern of supply is fairly typical for most major Italian fruit juices and nectars producers. The concentrate is then rehydrated, sterilised and packaged on the same production line that is used for Parmalat's UHT milk products.

Fruit juices and nectars are considered to be a sector with very good growth potential. There are approximately six major producers of fruit juices and nectars in Italy, which can be broadly grouped into two categories: companies primarily involved in the transformation of vegetables and fruit (like Zuegg, Conserve Italia and Confruit) and companies like Parmalat which are well established across diverse sectors of the Italian food and drinks industry. Competition within the fruit juice market is relatively concentrated compared to the fragmentation which characterises most other sectors of the Italian food and drink industry, with the two leading producers accounting for over 50.0 per cent. of total sales in 1997. According to Nielsen statistics and Parmalat's evaluation, in the fruit juice market Parmalat is market leader in Italy with a 32.1 per cent. market share, followed by Zuegg. In addition, Parmalat is leader in Brazil having 51.0 per cent. of the fruit juice market in 1997. However, as a whole, Brazil is not significant because of the comparatively high quantities of fresh fruit consumed by the local population.

25

HANC 004757

The market for tomato products is very fragmented and typically mature. It is shifting away from whole peeled tomatoes, towards strained and chopped products, due to their greater ease of use and longer shelf life. This development suits Parmalat, as its product range lies at this end of the market. Parmalat ranked between second and third in this sector of the Italian market in 1997. Tomato products are also produced in Argentina, Portugal and Brazil.

## Bakery products

The bakery products division comprises snacks, biscuits, pastries, together with bread-based, oven-ready items such as pizza, focaccia and speciality breads. It accounted for 7.3 per cent. of Parmalat's consolidated sales worldwide and 4.2 per cent. of consolidated net operating profits in 1997. Historically, operating margins for the bakery products division have been low compared to the Company's other divisions as a result of the significant advertising expenses required to compete in this market and the relatively low volume of product sales. In 1997. Return on Sales for the division was low at 4.9 per cent. compared with an average of 8.3 per cent. for the Company.

Bread-based products are a small niche market within the much larger fresh bread market. With the introduction of its oven-ready pizza and focaccia in 1985, Parmalat virtually created the oven-ready bread based products market in Italy.

With reference to snacks, cookies and pastries, the Italian market is characterised by significant market concentration and considerable competition between the two market leaders. In the snack market, where Barilla and Ferrero represent over 60.0 per cent. of total sales, Parmalat is finding it difficult to compete efficiently.

## Distribution and Customers

Distribution methods vary based upon the countries in which Parmalat operates. The following discusses the distribution methods and customers in the most significant geographic areas in which Parmalat operates.

### Italy

In Italy Parmalat has distribution contracts with approximately 200 independent contractors, and serves approximately 80,000 retail customers throughout Italy.

In Italy, Parmalat distributes the majority of its products through independent distributors who negotiate sales and deliveries directly with small retailers. These sales and deliveries are monitored daily by Parmalat on a nationwide basis by a computer tracking programme connected to the distributors as a means of monitoring sales trends and more precisely estimating demand. Sales to supermarket chains are arranged directly through Parmalat employees, who visit the supermarkets periodically.

The distribution of pasteurised milk and cream, which requires refrigeration and has a shelf life of only five days as compared to three months for UHT milk products, is conducted more frequently, using refrigerated trucks. Generally, pasteurised milk is delivered to small stores nightly between 1.00 a.m. and 8.00 a.m. Pasteurised milk is not sold in significant quantities in supermarkets in Italy.

### Europe (excluding Italy)

In Europe outside of Italy, distribution is less sophisticated than in Italy. In Portugal independent contractors and Parmalat's own trucks and distributors are used to distribute Parmalat products produced in Portugal or imported to its plants from Italy. Big supermarket chains dominate the Portuguese market and there are consequently fewer retail customers than in Italy.

In Eastern Europe, distribution to stores is conducted mainly through Parmalat's own distribution network. Parmalat distributes its products through its own distribution network in Hungary.

### South America

In South America the retail market is generally characterised in Brazil and Venezuela, its two main South American markets, by very large supermarkets.

Items not delivered directly by Parmalat sometimes go to its intermediary storage warehouses. Inventory at the warehouses is monitored daily. In addition, independent distributors deliver products including pasteurised milk to small retail stores.

HANC 004758